IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,726






MARTIN ROBLES, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM NUECES COUNTY






 Price, J., delivered the opinion of the Court, in which Meyers, Womack,
Johnson, Keasler, Hervey, and Holcomb, JJ., join. Cochran, J., concurred in
point of error eight and otherwise joins the opinion of the Court. Keller, P.J.,
concurred.



O P I N I O N



 The appellant and his codefendant, Joe David Padron, illegally entered a home
while the occupants were asleep and shot and killed Jesus Gonzalez and John Commisky.
For this conduct, a Nueces County jury convicted the appellant of two counts of capital
murder. (1) Pursuant to the jury's answers to the special issues set forth in Code of Criminal
Procedure Article 37.071, sections 2(b) and 2(e), the trial court sentenced the appellant to
death. (2) Direct appeal to this Court is automatic. (3) The appellant raises nine points of
error. We shall affirm.

II. Jury Selection

 In his first point of error, the appellant claims that the trial court erred in denying
him a full and fair voir dire examination by restricting relevant inquiry concerning the
facts of the case. Juror questionnaires asked jurors to state any questions they had. 
Venire Member Julian Sanchez asked, "Why two lives?" During Sanchez's voir dire,
defense counsel referred to that question in the following exchange:

 [Defense counsel]: What did you need to know, sir?


 [Sanchez]: I just - Why was [sic] two lives taken?


 Q: Okay.


 A: That's it.


 Q: What I think the state's evidence is gonna be is that the two people that
were killed were in a gang, and - 


 [Prosecutor]: Your Honor, I'm going to object to
[defense counsel] telling this juror what my evidence is going
to be in the trial, or, actually, what any of [the] evidence is
gonna be in the trial. I think that's improper.


 [Defense counsel]: Judge, I - That's a new one on me,
because any time you voir dire the jury, you've gotta give
them an idea about what the evidence is gonna be, so you can
get their biases and things like that.


 THE COURT: I don't agree with you. I think that's
for opening statements. You can discuss matters, but you
cain't [sic] discuss what the evidence is gonna be.


 [Prosecutor]: You can discuss issues, but not evidence.


 THE COURT: I agree.

 

 [Prosecutor]: And that, I think, is what the law is.


 [Defense counsel]: Well, note my - 


 THE COURT: Rephrase - you can ask the same
questions, [defense counsel], just rephrase the question.


 [Defense counsel]: Some of the issues in the case would be the fact that
they're gonna claim that my client was in a gang, and that the two fellows
that were killed we're [sic] in a gang - 


 [Prosecutor]: Judge, that's just -


 THE COURT: You're doing the same thing.


 [Prosecutor]: - ignoring the Court's ruling, and is
going around it, and I object.


 [Defense counsel]: Judge, if the Court is instructing
me not to go into the evidence that I expect the state to show,
for the purpose of voir dire, that's fine, and I won't do it, if I
can get a specific instruction from the Court. 


 THE COURT: The instruction is, do not go into
specifics of what you expect the evidence to show.


 [Defense counsel]: Okay.


 THE COURT: You can go into specifics of, how do
you feel about gangs, if, you know, the evidence were to
show? If - Do you understand?


 [Defense counsel]: I understand the Court's ruling.


 THE COURT: I'm telling you, you can do the same
thing, [defense counsel], without telling the juror, This is
what we expect the evidence to show. Okay? Now, opening
statements is a completely different situation.


 [Defense counsel]: Very well.


 On appeal, the appellant contends that the trial court's instruction prevented him
from discussing with Sanchez and the remaining venire members what the evidence was
expected to show and from exploring their biases and prejudices.

 The appellant has not preserved this issue for review. Although there was some
initial disagreement between defense counsel and the prosecutor about what could be
asked, defense counsel ultimately asked the trial court to state its instruction on the issue. 
After hearing the trial court's instruction, defense counsel said "okay" and "very well." 
He did not state an objection for the record and did not request a running objection with
respect to other venire members. (4) Point of error one is overruled.

 In his second point of error, the appellant claims that the trial court erred in
granting the State's challenge for cause to venire member Angela Cox, in violation of his
rights under the Sixth, Eighth, and Fourteenth Amendments to the United States
Constitution. The appellant contends that Cox was wrongly disqualified on the basis of
her views about the death penalty. (5) 

 Cox stated repeatedly that she would answer the special issues in such a way as to
result in a death sentence only in cases involving a child victim or a victim who had been
tortured; in all other circumstances, including those alleged in the appellant's indictment,
Cox stated that she would always answer the issues in such a way that a life sentence
would be imposed. Cox was unwavering in her position, restating at the close of her voir
dire that she would vote to impose the death penalty only in these circumstances: "Just
children and torture." The State's challenge for cause on these grounds was granted. 

 In Rocha v. State, (6) we upheld the trial court's granting of the State's challenge for
cause against a venire member who stated that she could never consider the death penalty
for a murder committed in the course of a robbery. We explained that a venire member is
challengeable for cause if she could never vote to impose the death penalty for a
statutorily classified capital murder offense because the person does not accept that
offense as a valid criterion for imposing a sentence of death. (7)

 In this case, Cox said that she could never consider the death penalty in any case
that did not involve child victims or victims of torture. She would never answer the
punishment issues in such a way as to result in the death penalty for a murder committed
in the course of a robbery that did not involve these types of victims. The trial court did
not abuse its discretion in granting the State's challenge for cause. Point of error two is
overruled.

II. Evidentiary Issues

A) Hearsay Statement Against Interest

 In his third point of error, the appellant claims that the trial court erred by allowing
hearsay testimony from Robert Lara. Lara testified about statements made to him by Joe
David Padron, in which Padron implicated himself and the appellant in the murders. The
testimony was admitted as statements against penal interest. The appellant argues that the
statements were not against Padron's penal interest and were not corroborated by
circumstances indicating trustworthiness as required by Rule of Evidence 803(24). (8)

 In a hearing outside the presence of the jury, Lara testified that he and Padron were
assigned to the same cell block designated for members of the Raza Unida gang. Lara
stated that, when Padron was first brought into the cell block, he did not know Lara and
asked one of the other gang members in the cell block if Lara could be trusted. Once
assured that Lara was trustworthy, Padron began telling everyone that he did not
understand how he had been caught so quickly and that he suspected the appellant had
"snitched." Lara later had a private conversation with Padron in which Padron told him
about committing the instant offense with the appellant. 

 Padron said that the appellant picked him up in a truck or Bronco and told him that
they were "going to take care of business." When they arrived at the house where the
murders were to take place, they took the chain off the fence and went in through a side
or back door at the kitchen. They saw someone who they thought was a woman asleep on
the couch, and they continued looking until they found a room where there were two
people lying in a bed. Padron stated that he was the one with the high-caliber rifle. He
said that he and the appellant just started shooting. 

 Lara's testimony before the jury was substantively the same as the testimony he
gave during the hearing, but he also testified that Padron had told him about some of the
events leading up to the murders, including a stabbing of two gang members and a drive-by shooting at a gang member's house. Lara testified that, according to Padron, the
appellant said that the drive-by shooting was the "last straw" and that "enough was
enough."

 The appellant objected to the admission of Lara's testimony as hearsay and argued
that it was not admissible as statements against Padron's penal interest because Padron
would not have anticipated any penal consequences from bragging to a fellow gang
member about his participation in a homicide. The appellant makes the same arguments
on appeal.

 Texas Rule of Evidence 803(24) provides that a hearsay statement against the
declarant's penal interest may be admissible if corroborating circumstances clearly
indicate the statement's trustworthiness. A trial court's ruling on the admissibility of a
hearsay statement pursuant to a hearsay exception is a matter of discretion and reviewed
under an abuse of discretion standard. (9)

 Padron's statements were clearly against his penal interest. His statements that he
and the appellant shot the victims inculpated himself in a capital murder. The concern
that statements of a co-defendant that inculpate the defendant might be an effort at blame-shifting does not apply here because the statements inculpate Padron and the appellant
equally. (10) 

 We are not persuaded by the appellant's argument that the statements were not
against Padron's penal interest because Padron was merely bragging to other gang
members, which would have actually elevated his status within the gang. The statements
implicated Padron in a very serious crime regardless of how they might have been viewed
by other gang members. There is always a risk that the person to whom a statement is
made will, for any number of reasons, repeat the statement to others or even to
authorities. As explained by a court of appeals addressing this exact issue:

 [The declarant] and possibly others were bragging about their participation
in the crime. While the declarant may have intended it to enlarge his
reputation or uttered it merely for the irrational pleasure of reliving the
event, the statement was essentially a confession to the crime. Confessing
to criminal conduct is usually against one's interest, at least to the extent
that an addressee will later reveal the statement to the authorities in an
effort to exonerate himself or another accused. (11)

 We conclude that Padron's statements were against his penal interest, despite the
fact that the statements might have increased his status with other gang members. We
must now determine if corroborating circumstances clearly indicate the statement's
trustworthiness.

 Padron's statements about the crime suggest trustworthiness because the details
generally could not have been learned from a newspaper or other outside source. For
instance, Padron described the fence and, to some extent, the lay-out of the house. He
stated that he remembered seeing a woman asleep on the couch and described finding the
targets asleep on a bed in another room. He also identified the stated motives for the
murder: the stabbing of Padron's fellow gang members and a drive-by shooting of a
named gang member's house. 

 The possibility that the statements might have been fabricated by Padron for the
purpose of increasing status among gang members is a factor to consider. However, Lara
testified that Padron checked with another gang member in the cell block to make sure
Lara could be trusted before talking openly about his involvement in the crime. Padron
obviously felt that he could speak freely to fellow gang members whom he trusted. 
Lara's potential motives for fabrication should be considered in addressing
trustworthiness as well, but in this case there are sufficient indicia of reliability within the
statement itself to outweigh these concerns. 

 Given the context in which the statements were made and the details revealed in
the statements, the trial court did not abuse its discretion in finding that there were
corroborating circumstances that clearly indicated that the statements were trustworthy. 
Point of error three is overruled.

 In his fourth point of error, the appellant claims that the trial court violated his
confrontation rights by limiting the cross-examination of Robert Lara and Vino Garcia
about their agreements with the State. The appellant has failed to preserve this issue for
review with regard to each witness.

 The appellant cross-examined Lara extensively about his criminal history, his
pending charges in an aggravated robbery case, and his deal with the State in the
aggravated robbery case in exchange for his testimony against the appellant. Although
the appellant elicited the fact that the pending aggravated robbery case involved a
weapon, he was not allowed to elicit testimony about the type of weapon used or whether
there was an injured victim. The appellant argued that he should have been allowed to go
into those facts to establish witness bias, but he never articulated a legal basis in support
of his position. On appeal, he asserts a Confrontation Clause violation. But the
Confrontation Clause is not the only authority applicable to the appellant's claim. The
Rules of Evidence also address impeachment regarding witness bias. (12) Because the
appellant did not identify the basis of his position at trial, he did not preserve the
Confrontation Clause issue he now raises on appeal. (13) 

 The appellant's complaint that his cross-examination of Garcia was limited
improperly is not preserved for review because the appellant never attempted to cross-examine Garcia, and therefore never obtained a ruling, about the matters he now
complains he was not allowed to address. The appellant claims he avoided these matters
with Garcia because of the trial court's ruling on the issue during Lara's testimony. 
Regardless of the appellant's belief that the trial court would rule against him, he was
required to seek a ruling in order to preserve error with respect to Garcia. (14) Point of error
four is overruled.

B) Demonstrative Evidence


 The appellant's fifth, sixth, and seventh points of error pertain to the appellant's
compelled display of a tattoo during the punishment phase of trial. According to
descriptions in the record, the tattoo at issue depicted "Jesus with a demon devouring his
brains." The tattoo was on the appellant's shoulder, and the appellant was required to
remove his jacket and shirt to display it. Prior to the admission of the punishment
evidence and during a hearing outside the presence of the jury, the appellant made a
motion in limine in anticipation of the State's offering of the tattoo. The appellant argued
that the tattoo was not relevant, that any relevance was substantially outweighed by its
prejudicial effect, and that admitting it would violate the appellant's rights under the Fifth
and Sixth Amendments. The State argued that the tattoo showed "a complete disrespect
to Christ, the person that stood for peace and love and forgiveness" and was therefore
relevant to future dangerousness. The State also noted that although it would not violate
the appellant's rights to require him to take off his shirt in the courtroom, it preferred to
offer photographs of the tattoo.

 The trial court asked the appellant whether he would prefer to display the tattoo in
photographs or by disrobing in the courtroom, if the evidence were to be admitted. The
court reminded the appellant that the jury was allowed to take photos with them into the
jury room. Without waiving any of his objections to the admission of the evidence, the
appellant stated that he would prefer to disrobe. The court stated that it would not allow
admission of photos and would rule on the appellant's disrobing when the issue came up
during trial. 

 The prosecutor's opening punishment statement warned the jury that, in addition to
some gang-related tattoos, they would see "some disturbing tattoos of demons and
religious figures, and the most offensive tattoo, you're gonna see a tattoo on his arm - of
a demon eating the brains of Christ on his arm." After opening statements and before
calling its first witness, the State asked the appellant to stand and take off his jacket and
shirt in order to display his tattoos to the jury. The appellant repeated his objections. The
trial court overruled the objections and directed the appellant to stand and display his
tattoos from counsel table. The appellant complied.

 In closing arguments, the prosecutor argued that the tattoos were displayed to the
jury "to educate you as to [the appellant's] philosophies, his belief systems, what he is
about." He elaborated:

 [Y]ou have a demon eating the brains of Christ. There was Christ, with the
crowns, and what kind of looks like grapes, and then you have a demon
putting it like that. Now, I don't know what that means, but to me it's a bad
thing. That to me is a philosophy. I don't know if it's satanic. . . . but it
tells you something about him as a person, that ought to tell you where his
belief system is.


 In his fifth point of error the appellant claims that the compelled display of the
tattoo was a violation of his right not to incriminate himself under the Fifth Amendment. 
The Fifth Amendment does not protect against the compelled production of every sort of
incriminating evidence. (15) The privilege protects a person only against being incriminated
by his own compelled testimonial communications. (16) Testimonial communications are
those that "explicitly or implicitly, relate a factual assertion or disclose information." (17) 
The appellant argues that the tattoo was testimonial because the State argued that it
communicated his "philosophies and belief systems."

 The United States Supreme Court has held that documentary communications are
not compelled testimonial communication within the meaning of the Fifth Amendment
when voluntarily prepared prior to the requested production. (18) Production of a pre-existing document does not "compel the [defendant] to restate, repeat, or affirm the truth
of the contents of the documents." (19)

 Although the tattoo's relevance is derived from what it communicated to others,
the appellant was not compelled by State actors to create it. In this way, the appellant's
tattoo is more akin to a pre-existing documentary communication than to a compelled
testimonial communication. The appellant was merely asked to show the jury something
he had created voluntarily before his appearance in court. The exhibition of the tattoo did
not compel the appellant to say anything about its meaning. The trial court did not violate
the appellant's Fifth Amendment rights by requiring him to display the tattoo. Point of
error five is overruled.

 In his sixth point of error, the appellant claims that the trial court erred in allowing
the State to use the appellant's tattoo as a reason for imposition of the death penalty in
violation of due process, equal protection, and freedom from cruel and unusual
punishment. Specifically, the appellant contends that the State's argument that the tattoo
represented the appellant's philosophy and was therefore relevant to the issue of future
dangerousness improperly injected religion into the case.

 During the punishment phase of a capital murder trial, evidence may be presented
as to any matter the court deems relevant to the special issues, including the defendant's
background or character. (20) A defendant's choice of tattoos is some evidence of his
character. (21) Tattoos may also be evidence of the defendant's beliefs or his motive for
committing the crime. (22) This kind of evidence is relevant to the issue of future
dangerousness. (23) 

 The State did not inject the issue of religion into the case. Any reference to
religion was raised by the tattoo alone. The prosecutor did not refer to the appellant's
religion or lack thereof. He stated that the tattoo depicted a "demon eating the brains of
Christ" and that this depiction might be viewed as an expression of the appellant's
philosophy and beliefs. These are matters relevant to character and therefore have a
bearing on an assessment of future dangerousness. The federal cases relied upon by the
appellant are distinguishable because they all involved references to religion that were
made at the guilt or innocence phase of the trial where character is not in issue. (24) Point of
error six is overruled.

 In the appellant's seventh point of error, he argues that the prejudicial effect of the
tattoo substantially outweighed any probative value it had on the issue of future
dangerousness in violation of Rule of Evidence 403. Rule 403 favors admission of
relevant evidence and implies a presumption that relevant evidence is more probative than
prejudicial. (25) "All testimony and physical evidence will likely be prejudicial to one party
or the other. It is only when there exists a clear disparity between the degree of prejudice
of the offered evidence and its probative value that Rule 403 is applicable." (26) A proper
403 analysis includes, but is not limited to, consideration of four factors: (1) the probative
value of the evidence; (2) its potential to impress the jury in some irrational yet indelible
way; (3) the time needed to develop the evidence; and (4) the proponent's need for the
evidence. (27) Questions of admissibility under Rule 403 are subject to review only for an
abuse of discretion. (28)

 The appellant contends that, because there was no connection or nexus between
the type of tattoo and the nature of the crime or the motive behind the crime, the tattoo
had little probative value apart from its religious significance. The State argues that the
tattoo was evidence relevant to the special issue on future dangerousness because it was
indicative of the appellant's character. The State also argues that the tattoo was
prejudicial, but not unfairly so because the appellant chose to have the tattoo "depicting
that which is evil triumphing over that which is good."

 We will assume, without deciding, that the trial court erred in admitting the tattoo
before the jury. Even so, we conclude that the appellant was not harmed by the trial
court's admission.

 Because no constitutional error is involved when evidence is admitted under Rule
403, we look to the nonconstitutional standard in Rule of Appellate Procedure 44.2(b). 
Under Rule 44.2(b), reviewing courts should disregard any error that did not affect the
appellant's substantial rights. (29) We have interpreted this to mean that the conviction
should not be reversed when, after examining the record as a whole, the reviewing court
has a fair assurance that the error did not influence the jury or had but a slight effect. (30) In
assessing the likelihood that the jury's decision was adversely affected by the error, we
consider everything in the record, including any testimony or physical evidence admitted
for the jury's consideration, the nature of the evidence supporting the verdict, the
character of the alleged error and how it might be considered in connection with other
evidence in the case. (31) We also consider the jury instructions, the State's theory and any
defensive theories, closing arguments, voir dire, and whether the State emphasized the
error. (32)

 The record does not contain a photo of the tattoo. (33) The record does not reflect the
tattoo's size, how graphic it was, how detailed, or even the distance between the jurors
and the appellant as he displayed the tattoo. The presentation of the tattoo appears to
have been brief, and did not require the appellant to approach the jury. It was mentioned
by the prosecutor in his opening statement during the punishment phase, and it was the
first order of business before the jury in the punishment phase of the trial. It was also
mentioned in the closing arguments.

 The evidence presented during the guilt phase of the trial, which was relevant to
the jury's punishment-phase determination of future dangerousness, included testimony
that the appellant broke into a house at 3 a.m., looking for one of the sons in the family. 
He waved a gun around, threatened family members, and struck the father in the face with
the gun before leaving. He shot and killed the two victims while they were asleep in bed.

 During the punishment phase, the State presented evidence that, before the
appellant's involvement in this case, the appellant pled guilty to murder with a deadly
weapon and was sentenced to six years' imprisonment. Although the appellant was not
the shooter in that offense, he was armed. 

 The appellant's records from the Department of Criminal Justice indicate that he
began using marijuana and inhalants at age ten, mushrooms and acid at age fourteen, and
cocaine at age fifteen. He was an admitted alcoholic. He also admitted to joining the
"Clyde Crew" gang at age fourteen. The appellant reported that activities of the Clyde
Crew gang included car-jacking and running drugs. While serving his sentence on his
murder conviction, the appellant was the subject of four disciplinary reports. Two of the
incidents involved altercations with other inmates, one was a failure to follow orders, and
in one, the appellant was found in possession of a weapon, a metal rod with a sharpened
point. Prison records reflect that prior to his murder conviction, the appellant was
arrested eleven times, and was placed several times in the county juvenile facility.

 The tattoo was not particularly critical to the State's case, although it was the only
evidence of its kind. The facts of the case were very serious: entering a family home in
the early morning hours, killing two people and injuring another man. The offense in this
case, along with the evidence demonstrating the appellant's escalating and increasingly
violent criminal behavior, was much more relevant to the jury's decision on the
appellant's future dangerousness than the tattoo. Under these circumstances, we have a
fair assurance that admission of the tattoo did not influence the jury or had but slight
effect. Point of error seven is overruled.

C. Disciplinary Reports


 In his eighth point of error, the appellant claims that the trial court erred in
allowing inadmissible hearsay accounts of uncharged prison misconduct. Specifically,
the appellant complains about two Department of Criminal Justice disciplinary reports. 
The appellant contends that the reports were inadmissible hearsay under Rule of Evidence
803(8)(B), as matters observed by "other law enforcement personnel."

 The reports were included within a penitentiary packet designated as State's
Exhibit 75. When the State proffered Exhibit 75, the appellant stated that it contained
"extraneous hearsay matters" and asked if they could have a hearing on it later. The court
noted the appellant's objection and stated that the packet would be reviewed before being
released to the jury and portions would be redacted, if necessary. 

 After the State's last punishment witness, the prosecutor re-offered Exhibit 75. 
Outside the presence of the jury, the appellant objected to one report on the ground that
the policemen involved in the incident were not identified by name and to another report
as being "hearsay within a business record." On appeal, the appellant contends the
reports were inadmissible because they were matters "observed by other law enforcement
personnel" under Rule 803(8)(B). The appellant's trial objections do not comport with
the specific claim he now raises on appeal. He has failed to preserve error. (34) Point of
error eight is overruled.

D. Evidence of the Potential for Parole Law Changes


 In point of error nine, the appellant claims that the trial court erred in allowing the
State to elicit testimony that the parole laws could change so that the appellant might be
released on parole before the expiration of forty years on a life sentence. Prior to the
appellant's case at punishment, the appellant presented a motion in limine asking the
court to instruct the State "not to allude to any possibilities that the laws would change as
far as the period of time [the appellant] would have to serve if he receives a life
sentence." The motion was granted. 

 During the punishment phase, the appellant called Dr. Dennis Longmire, who
testified as an expert about various aspects of the Texas penal system. Longmire testified
that a person who receives a life sentence must serve forty years before he is eligible for
parole. The appellant then asked Longmire if the law had changed over the years
regarding the amount of time that must be served. Longmire responded:

 Well, I believe the law began to change around '93 - 1993. Prior to 1993,
capital murderers sentenced to life, capital life, became eligible for parole in
around 12 years or 15 years. In '93 there was a requirement that they be -
that they spend at least 35 calendar years, and then, in '95 that became 40
calendar years, and so, at this point in time that's the current law . . ..


During the State's cross-examination of Longmire, the prosecutor asked to approach the
bench, and then stated that he believed that the appellant had violated his own motion in
limine by asking Longmire about how the parole law had changed over the years. The
prosecutor sought permission to ask Longmire whether it was possible that the law could
change in the other direction. The court agreed that the appellant had opened the door
with his question and allowed the following cross-examination about which the appellant
now complains:

 [Prosecutor]: I believe, Dr. Longmire, that you testified, under [defense
counsel's] direct examination, that the law has changed over the years
regarding what the minimum parole eligibility is for parole. Is that correct?


 A: That's correct.


 Q: Is there any guarantee you can have for this jury - 


 [objection made and overruled]


 A: Is there any guarantee, Dr. Longmire, you can offer this jury that the
legislature will not reverse their position on what the minimum parole
eligibility will be over the next few years?


 [objection made and overruled]


 A: I can't guarantee what the Texas legislature will do in any case.


On re-direct examination, the appellant elicited testimony from Longmire that the current
trend in Texas was toward harsher punishments and that there was no reason to think that
a change in the parole eligibility law would apply retroactively to the appellant.

 The appellant's motion in limine sought to preclude the State from asking
Longmire questions suggesting that the law could change affecting the period of time
required to be served on a life sentence in a capital case. Despite his own motion, the
appellant asked Longmire whether the laws had changed in the past regarding the amount
of time to be served on a life sentence. The trial court correctly ruled that the appellant's
question about past laws that have changed opened the door to the prosecutor's questions
asking whether those laws could change in the future. (35) The appellant's ninth point of
error is overruled.

 The judgment of the trial court is affirmed.


Delivered: April 26, 2006


Do not publish.
1. Tex. Pen. Code § 19.03(a)(2).
2. Tex. Code Crim. Proc. Art. 37.071 § 2(g).
3. Tex. Code Crim. Proc. Art. 37.071 § 2(h).
4. Tex. R. App. P. 33.1. 
5. See Wainwright v. Witt, 469 U.S. 412, 424 (1985) (holding that a potential juror is not
challengeable for cause on the basis of scruples against the death penalty unless her views would
prevent or substantially impair the performance of her duties as a juror in accordance with her
instructions and oath).
6. 16 S.W.3d 1, 8 (Tex. Crim. App. 2000).
7. Ibid.
8. The appellant also alleges that the statements were admitted in violation of the
Confrontation Clause as interpreted by Crawford v. Washington, 541 U.S. 36, 68 (2004) (holding
that hearsay statements that are testimonial must have been made by an unavailable declarant
with a prior opportunity for cross-examination to satisfy the Confrontation Clause), but he did
not assert an objection on constitutional grounds at trial and therefore has not preserved the issue
for review. Tex. R. App. P. 33.1.
9. Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); Cunningham v. State, 877
S.W.2d 310, 313 (Tex. Crim. App. 1994).
10. See Dewberry v. State, 4 S.W.3d 735, 744-45 (Tex. Crim. App. 1999) (stating
"admission against a co-defendant declarant's interest can be admissible [under Rule 803(24)]
against the defendant so long as it is sufficiently against the declarant's interest to be reliable").
11. Vasquez v. State, 902 S.W.2d 627, 635 (Tex. App.-El Paso 1995), rev'd on other
grounds, 919 S.W.2d 433 (Tex. Crim. App. 1996).
12. See, e.g., Tex. R. Evid. 611, 613(b). 
13. Tex. R. App. P. 33.1. 
14. Tex. R. App. P. 33.1.
15. Fisher v. United States, 425 U.S. 391, 408 (1976). 
16. Ibid.; see also Williams v. State, 116 S.W.3d 788, 791 (Tex. Crim. App. 2003).
17. Doe v. United States, 487 U.S. 201, 210 (1988).
18. Fisher, 425 U.S. at 409-410 & n.11 (stating that one reason subpoenaed documents
were not "compelled testimonial communications" is because "the preparation of all of the
papers sought in these cases was wholly voluntary" and "unless the Government has compelled
the subpoenaed person to write the document . . . the fact that it was written by him is not
controlling with respect to the Fifth Amendment").
19. Ibid.
20. Tex. Code Crim. Proc. Art. 37.071 § 2(a). 
21. Conner v. State, 67 S.W.3d 192, 201 (Tex. Crim. App. 2001).
22. Banda v. State, 890 S.W.2d 42, 62-63 (Tex. Crim. App. 1994).
23. Conner, 67 S.W.3d at 201; Banda, 890 S.W.2d at 62; cf. Corwin v. State, 870 S.W.2d
23, 35 (Tex. Crim. App. 1993) (recognizing that defendant's drawing of "a large green monster
holding a bloody-bladed axe in one hand and the scalp of a woman in the other with a body
wrapped in the tail" had "an inferential bearing on his character for violence, which relates in
turn to the question of future dangerousness").
24. United States v. Giry, 818 F.2d 120, 132-33 (1st Cir. 1987); United States v. Goldman,
563 F.2d 501, 504-05 (1st Cir. 1977).
25. McFarland v. State, 845 S.W.2d 824 (Tex. Crim. App.1992), cert. denied, 508 U.S. 963
(1993).
26. Jones v. State, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 832
(1997).
27. State v. Mechler, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005).
28. Ibid.
29. Tex. R. App. P. 44.2(b).
30. Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App.1998).
31. Motilla v. State, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).
32. Id. at 355-56.
33. The State did offer into evidence a photograph of the Raza Unida "stampa" which is
tattooed on the appellant's forearm. A large tattoo on his upper arm is also visible in that
photograph, but it is not clearly depicted and the record makes no reference as to what that tattoo
might be.
34. Tex. R. App. P. 33.1; Resendiz v. State, 112 S.W.3d 541, 547 (Tex. Crim. App. 2003),
cert. denied, 541 U.S. 1032 (2004). 
35. See Ripkowski v. State, 61 S.W.3d 378, 393-94 (Tex. Crim. App. 2001); Fuentes v.
State, 991 S.W.2d 267, 279 (Tex. Crim. App. 1999).